## CAMPBELL et al. v. JONES & LAUGHLIN STEEL CORPORATION.

### No. 5788.

District Court, W. D. Pennsylvania.
April 4, 1947.

Jason Richardson, of Pittsburgh, Pa., for plaintiffs.

H. Parker Sharp, Alan D. Riester and Robert H. Strub, all of Pittsburgh, Pa., for defendant.

McVICAR, District Judge.

This is an action by sixty two plant guards of the defendant to recover from defendant unpaid overtime compensation, liquidated damages, attorneys fees and costs, in accordance with the provisions of the "Fair Labor Standards Act of 1938."

The question involved is whether plaintiffs are entitled to be paid on the basis of a twenty four hour day for time that they spent for the defendant as plant guards during a strike at defendant's steel plant in Pittsburgh in 1946.

The Jones & Laughlin Steel Corporation, defendant, owns a large plant for the manufacture of iron and steel, situate on the north and south sides of the Monongahela River in the City of Pittsburgh. It has a large number of employees. It is engaged in interstate commerce. The sixty two plant guards were employed as plant guards by the defendant during the months of January and February, 1946 and the most of them had been in said employ for a number of years prior thereto. The plaintiffs were members of a union. It became known that a strike of the production workers at said plant had been called for January 21, 1946. The production workers started to go off duty January 18, 1946.

Captain Nicholson was over the plant guards. He advised these men that in event of a strike, it would become necessary for them to bring their clothes and to stay *in the mill during the time of the strike.* On January 18, 1946, the men were notified of the strike. They were advised to bring in their clothes and to stay at the mill. They did so until the strike was over February 9, 1946.

During the time of the strike, the mill was picketed. Passes were procured by the plaintiffs so that they could go through the picket lines. During the time the men were in the mill, they were fed by defendant, the food being satisfactory. They were furnished cots located at different places in the mill to sleep upon. These cots, by reason of being without springs and the other comforts of a bed and also by reason of being located where there was noise and confusion, affected the amount of sleep which the men could get. Probably six hours was the maximum sleep or rest that any plaintiff got while off duty each day.

The men worked on eight hour shifts; they were eight hours on duty, then eight hours off; that meant that they were sixteen hours on duty, eight hours off on a given day; the following day, they would be eight hours on duty, sixteen hours off. It made an average number of hours on duty of twelve hours per day. The men were subject to call at all times, as it was not known by reason of the strike condition when they would be needed. They were only called a comparatively few times.

When the men were told of the threatened strike and that it would be necessary for them to come to the mill and bring their clothes and stay there, they were also ad-

vised that their pay would be on the basis of a twenty four hour day, the same as it had been during a strike in the same mill in 1937. The men were paid on the basis of a twenty four hour day for the first two days of the 1946 strike that they were in the mill, but subsequently, for some reason, a change was made and payment was made on the basis of an eight hour day with overtime.

The men could not leave the mill without permission of the defendant. They did not do so. The result was that during the time of the strike, the men had to leave their homes and usual sleeping places and any and all other avocations or associations that they may have had. The men were allowed to play games such as chess while off duty. Motion pictures were presented once or twice a week. Radios were located at some places in the mill. The entire twenty four hours, however, was spent by the plaintiffs predominantly for the benefit of the defendant and not for the benefit of the plaintiffs.

The Fair Labor Standards Act of 1938 provides in Section 16(b) that: "Any employer who violates the provisions of section 6 or section 7 of this act shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."

It provides in section 7(a), 29 U.S.C.A. § 207 (a), that: "No employer shall * * * employ any of his employees who is engaged in commerce or in the production of goods for commerce * * * for a workweek longer than forty hours * * * unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

The question arises under this Act how long was each plaintiff employed each day during the period in controversy. No case has been cited in which the facts are the same or substantially the same as the facts in this case. However, the Supreme Court has laid down some rules for guidance in the interpretation of the above Act.

In Skidmore et al. v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 163, 89 L.Ed. 124, which was a fire guards case, the Court in an opinion by Mr. Justice Jackson, stated:

"For reasons set forth in the Armour case [Armour & Co. v. Wantock], 323 U.S. 126, 65 S.Ct. 165, [89 L.Ed. 118] decided herewith we hold that no principle of law found either in the statute or in Court decisions precludes waiting time from also being working time. We have not attempted to, and we cannot, lay down a legal formula to resolve cases so varied in their facts as are the many situations in which employment involves waiting time. Whether in a concrete case such time falls within or without the Act is a question of fact to be resolved by appropriate findings of the trial court. Walling v. Jacksonville Paper Co., 317 U.S. 564, 572, 63 S.Ct. 332, 87 L.Ed. 460. This involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances. Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged. His compensation may cover both waiting and task, or only performance of the task itself. Living quarters may in some situations be furnished as a facility of the task and in another as a part of its compensation. The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was.

"We do not minimize the difficulty of such an inquiry where the arrangements of the parties have not contemplated the problem posed by the statute. But it does not differ in nature or in the standards to guide judgment from that which frequently confronts courts where they must find retrospectively the effect of contracts as to matters which the parties failed to anticipate or explicitly to provide for."

Also that "each case must stand on its own facts."

In Armour & Co. v. Wantock et al., 323 U.S. 126, 65 S.Ct. 165, 168, 89 L.Ed. 118, which was a fire guards case, the Court in

an opinion by Mr. Justice Jackson stated: "Of course an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a standby capacity. Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer. Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case. * * *

"We think the Labor Standards Act does not exclude as working time periods contracted for and spent on duty in the circumstances disclosed here, merely because the nature of the duty left time hanging heavy on the employees' hands and because the employer and employee cooperated in trying to make the confinement and idleness incident to it more tolerable. Certainly they were competent to agree, expressly or by implication, that an employee could resort to amusements provided by the employer without a violation of his agreement or a departure from his duty. Both courts below having concurred in finding that under the circumstances and the arrangements between the parties the time so spent was working time, we therefor affirm."

It therefore appears that the Supreme Court has determined that each case is to stand on its own facts; that the Court in applying the Act, should consider the contract between the employer and the employees; the nature of the service; the living quarters; all the arrangements made and the surrounding circumstances for the purpose of determining whether the time spent for which compensation is claimed under the Act, was predominantly for the benefit of the employer or the employees.

Under the above provisions of the "Fair Labor Standards Act of 1938", and in light of the rules of interpretation as laid down by the Supreme Court in the above cases, plaintiffs are entitled to be paid upon the basis of a twenty four hour day during the time that they were in defendant's mill, less time off when employees left premises with the permission of the defendant.

The defendant owned and operated a large steel mill. Plant guards were essential for the protection of their property. The plaintiffs were plant guards not only during the time of the strike but the most of them for many years prior thereto. They ordinarily worked a regular shift each day; they resided in their own homes. The strike in 1946 in the defendant's mill increased the danger to defendant's property. Defendant realized this. Consequently it made arrangements with the plaintiffs to leave their homes to stay in the mill during the entire time of the strike; the men to bring their clothes with them. The men, being notified, brought their clothes with them, they stayed in the mill during the entire time of the strike, except some short times in which defendant gave them permission to leave the premises. The men were furnished with cots which were rather a poor substitute for beds at home. They had little chance of recreation; they were subject at all times to call of defendant for the purpose of protecting the defendant's property. The men were told prior to the strike, that they would be paid on the same basis as during the 1937 strike, which was on the basis of a twenty four hour day. They were paid on this basis during the first two days of the 1946 strike, then for some reason, a change was made, and they were paid on the basis of a forty hour week with time and one-half for overtime.

The men worked eight hour shifts. They probably did not get more than six hours rest a day. They were called a number of times while off duty for service. The average time off duty each day was 10¼ hours, but the use of this time to the plaintiffs was affected by reason of the rotating shifts. The entire twenty four hours spent each day in the mill by each plaintiff was predominantly for the benefit of the defendant and not for the plaintiffs.

Let an order for judgment be prepared and submitted in accordance with the foregoing findings of fact, conclusions of law and this opinion.

The Court, after hearing, makes the following findings of fact and conclusions of law:

## Findings of Fact.

1. Each of the plaintiffs, sixty two (62) in number, were employed by the defendant, Jones & Laughlin Steel Corporation, as special patrolmen or plant guards in Defendant's Pittsburgh Works in the City of Pittsburgh, Allegheny County, Pennsylvania, during the work weeks from January 13, 1946 to January 12, 1946; from January 20, 1946 to January 26, 1946; from January 27, 1946 to February 2, 1946; and from February 3, 1946 to February 9, 1946.

2. Defendant is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania, having its principal executive offices in the City of Pittsburgh, Allegheny County, Pennsylvania, and owns and uses in the conduct of its business a manufacturing establishment known as its Pittsburgh Works located in the city of Pittsburgh.

3. Jurisdiction is conferred on the Court by Section 41 (8), 28 U.S.C.A. (Judicial Code, § 24), giving the District Court original jurisdiction of "all suits and proceedings arising under any law regulating commerce", and by Section 16 (b) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 216 (b).

4. Defendant is engaged in the manufacture of steel, and produces goods and products made of raw materials, a substantial part of which is shipped to the defendant's Pittsburgh Works from plants and factories outside the Commonwealth of Pennsylvania, and is engaged in interstate commerce. A major part of the steel goods and products manufactured and produced by the defendant are for shipment in interstate commerce, and have been sold, transported, shipped and delivered in interstate commerce from the defendant's Pittsburgh Works to various points outside the Commonwealth of Pennsylvania.

5. Each of the plaintiffs, sixty two (62) in number, as special patrolmen or plant guards employed by defendant, are engaged in interstate commerce within the meaning of the Fair Labor Standards Act of 1938.

6. Each of the plaintiffs, sixty two (62) in number, were originally hired by the defendant for an eight (8) hour work day and have been paid by the defendant at the rate of time and one half their regular hourly rate of pay for all work performed in excess of eight (8) hours per day or forty (40) hours per work week, except for the working time claimed in these proceedings.

7. Each of said plaintiffs, as a condition of their employment are required by the defendant to be duly commissioned and bonded as special patrolmen by the City of Pittsburgh.

8. Frederick B. McGuire, Michael A. Stosic, Albert A. Betz, John F. McGrath, Henry M. Wells, and C. L. McQueary were members of a committee, authorized to represent and bargain for all the plaintiffs in regard to hours of work, rate of pay, and conditions of employment.

9. The work week established by defendant in its Pittsburgh Works starts at 11:00 P.M. Saturday night and extends to 11:00 P.M. the following Saturday night.

10. The work day established by the defendant for all of the plaintiffs consisted of a first turn from 11:00 p. m. to 7:00 a. m., a second turn from 7:00 a. m. to 3:00 p. m. and a third turn from 3:00 p. m. to 11:00 p. m.

11. That G. D. Nicholson is the captain of all special patrolmen including the plaintiffs at the Pittsburgh Works of the defendant, and is in charge of the hours and working conditions of all of the plaintiffs, and that Captain H. G. Mauk is the captain of all of the police of the entire Jones & Laughlin Steel Corporation in all of its plants.

12. In the month of December, 1945, the plaintiffs were instructed by Captain C. D. Nicholson, to bring to the defendant's Pittsburgh plant, clothing, wearing apparel and such personal items as they would need in the event a strike occurred and they were required by the defendant to stay on the premises of the defendant.

13. Each of the plaintiffs, at that time, or before January 18, 1946, did bring on to the defendant's premises to wit, the

Pittsburgh plant, clothing, wearing apparel and personal effects to be used while the plaintiffs were on the defendant's premises.

14. In December, 1945, Captain C. D. Nicholson, requested of F. B. McGuire, Chairman of the committee representing all of the plaintiffs, that said F. B. McGuire obtain permission from the production workers union that said plant guards be allowed and permitted to leave and enter the mill in the event there was a strike, and F. B. McGuire did obtain such permission and the same was reported to Captain Nicholson before January 18, 1946.

15. On January 2, 1946, a committee consisting of Frederick B. McGuire, John F. McGrath, Albert A. Betz and Henry M. Wells, who represented all of the plaintiffs, met with Captain C. D. Nicholson and discussed hours of work, and methods of pay therefor for all of the plaintiffs in the event a strike occurred.

16. On January 7, 1946, the aforesaid committee with the addition of Michael A. Stosic, again met with Captain C. D. Nicholson to discuss hours of work and methods of pay therefor in the event of a strike of the production workers, at which time Captain Nicholson reported to the committee that during a previous strike in 1937, when the plant guards were in the plant twenty-four (24) hours, the plant guards were paid for the full time that they were in the mill, and there was no reason why the plant guards would not receive the same treatment this time in the event of a strike, and they might even get a bonus.

17. During a strike which occurred among the production workers employed by the Defendant in its Pittsburgh Works in the year 1937, which lasted approximately thirty-six (36) hours, some of the plaintiffs who were then employed by the defendant stayed in the plant during said strike and were paid for all time they were on the premises of the employers, or around the clock, even though a portion of said time was used by said plaintiffs in eating and sleeping.

18. At the meeting on January 7, 1946, the aforesaid committee representing all of the plaintiffs agreed with Captain Nicholson, that in the event of a strike, the plaintiffs would remain within the plant of the defendant, and would work eight (8) hours on duty, eight (8) hours off duty, around the clock in each twenty-four (24) hour period.

19. At the meeting of January 2, 1946 or January 7, 1946, Captain C. D. Nicholson stated to the committee that, during the strike the plaintiffs would be paid on a twenty-four (24) hour basis or around the clock.

20. On January 18, 1946, at about 8:00 P. M. the production workers of the defendant started to leave their places of work and the production of steel by the defendant ceased shortly thereafter.

21. On January 18, 1946, at about 8:00 P.M. all of the plaintiffs then and there at work on the defendant's premises remained on duty and all of the plaintiffs who were off the defendant's premises were called back to work and returned to the defendant's premises, reported for work, and were assigned their respective work.

22. After January 18, 1946, and until at least February 8, 1946, each and every one of the plaintiffs remained on the premises of the defendant except for certain periods of time when upon receiving permission from their superior officers they were permitted to leave said premises for certain periods of time and then return to said premises of the defendant.

23. Defendant provided sleeping quarters handy to or adjoining each of the plaintiffs respective places of duty on defendant's premises, on a temporary basis in office rooms and locker rooms by erecting canvas folding army cots and providing two blankets for each plaintiff, but defendant did not provide any sheets, pillows, mattresses or other sleeping equipment in connection with the said quarters, and in some cases no toilet facilities or washing facilities either for washing clothes or for personal needs were provided in conjunction with said quarters.

24. During a strike of the production workers at the Pittsburgh Works of the defendant, from January 18, 1946 to or about February 9, 1946, there was one occasion in which one of the plaintiffs was interrupted during his so-called rest or off

period for a time of two and one-half (2½) hours; that six (6) plaintiffs were interrupted for a period of forty (40) minutes; on another occasion two of the plaintiffs were interrupted from their rest time for a period of twenty (20) minutes; on another occasion five (5) of the plaintiffs were interrupted during their rest time for a period of four and one-half (4½) hours; and on another occasion one (1) of the plaintiffs was interrupted in his rest time for a period of two (2) hours.

25. That on January 18, 1946, the working arrangements theretofore entered into between the plaintiffs and the defendant were established and some of the plaintiffs worked from 11:00 P. M., January 18, 1946 to 7:00 A. M., January 19, 1946, at which time they were relieved and other plaintiffs worked from 7:00 A. M., January 19, 1946 to 3:00 P. M. January 19, 1946 at which time, to wit, 3:00 P. M., the plaintiffs who had worked 11:00 P. M. to 7:00 A. M. returned to work and hereby the routine of each plaintiff working and being on duty eight (8) hours and then having eight (8) hours off duty, but remaining within the premises of the defendant, and then eight (8) hours work, and so on around the clock in each twenty-four (24) hour period was established.

26. Not any of the plaintiffs worked twenty-four (24) actual guard or patrol duty on January 19, or January 20, 1946. They were paid by the defendant for twenty-four (24) hours work. They received an additional eight (8) hours overtime pay or a total of thirty-two (32) hours for each of said days.

27. That most of the plaintiffs and probably all of them, during the entire period they were on the premises of the defendant, did not receive more than six (6) hours continuous sleep.

28. That due to the rotation of eight (8) hours on duty and eight (8) hours off duty, none of the plaintiffs were allowed the same sleeping period in any two (2) consecutive days nor were their meal periods the same in any two (2) consecutive days unless their period of off duty on the defendant's premises of their active work was interrupted.

29. That not any of the plaintiffs during the entire time they were on the defendant's premises, could engage in any business or activity of a personal nature. They were subject to call while off regular duty. All of each twenty-four hour period was spent by each of the plaintiffs predominantly for the defendant's benefit and not for the plaintiffs' benefit.

30. Each of the plaintiffs were paid by the defendant a minimum of twelve (12) hours work per day plus overtime rate after eight (8) hours and each of the plaintiffs were paid for sixteen hours work per day when the two (2) working shifts occurred in any period of twenty-four (24) hours, plus time and one half rate for all over eight (8) hours.

31. Plaintiffs were advised by Captain C. D. Nicholson on January 25, 1946 that they were to be paid for staying on the defendant's premises only for the actual time worked by each of the plaintiffs, but plaintiffs were in fact paid by the defendant a minimum of twelve (12) hours per day during all of said period.

32. Commencing on January 30th or 31st, 1946, some of the plaintiffs were asked to remain on active duty work more than eight (8) consecutive hours on duty and some of the plaintiffs did work more than eight (8) consecutive hours active duty work, and such plaintiffs were paid for all hours actually worked plus overtime.

33. That on January 31, 1946, Captain C. D. Nicholson advised the committee representing the plaintiffs that if the plaintiffs left the premises of the defendant, their commissions as special patrolmen would be revoked, and thereafter a meeting was held on February 1, 1946 with the Director of Public Safety of the City of Pittsburgh in regard to the defendant revoking said commissions, but said commissions were not revoked and all of the committee returned to the defendant's premises.

34. During off duty hours, each of the plaintiffs was required to remain on the defendant's premises and their eating, sleeping, and recreational hours were scheduled by the defendant.

35. On January 31, 1946, Captain C. D. Nicholson reported to the grievance com-

mittee that the defendant would only pay the plaintiffs for actual time on duty. Plaintiffs agreed not to leave the defendant's premises after Captain Nicholson stated to them that they were police officers and as such were sworn to protect the defendant's premises. Plaintiffs returned to duty and resumed working eight (8) hours on and eight (8) hours off duty, remaining on the defendant's premises.

36. That each of the plaintiffs worked for the defendant all of the period of time from January 18, 1946 when they reported for duty at the plant of the defendant, except for such periods of time as they were absent from the premises with the defendant's permission, until February 8 or 9, 1946 when they left the defendant's premises for their homes and resumed the working schedules they normally worked before January 18, 1946 and for which they were originally hired.

37. That during the period from January 18, to February 9, 1946, each of the plaintiffs worked the total possible man hours set forth in defendant's Exhibit "B".

38. That each of the plaintiffs, from January 18, 1946 to February 9, 1946, had the average number of off duty hours per twenty four hour period specified in Exhibit "B". These off. duty hours were affected by the rotating shift duty arranged by the defendant.

39. That all of the time each of these plaintiffs was in the defendant's plant from January 18, 1946 to February 9, 1946 was time worked.

40. That on January 18, 1946, defendant had in its employ at the Pittsburgh Works, ninety (90) plant guards or special patrolmen who worked on a three (3) shift basis, thirty (30) men to a shift, and during the strike, the defendant desired to double its on duty force of plant guards, and did double its force by keeping the plant guards, including the plaintiffs on the defendant's premises twenty-four (24) hours a day.

41. The strike of the production and maintenance workers who were members of the union known as the United Steelworkers of America, and who were employed at defendant's Pittsburgh Works, although scheduled to begin at 12:01 a. m., Monday, January 21, 1946, actually began on the evening of Friday, January 18, 1946, and from the time it began, until 12:01 a.m., January 21, 1946, it was an unauthorized or "wildcat" strike.

42. While each plaintiff remained in the Works he was furnished, by the defendant, with ample quantities of good quality food.

43. Not any of the plaintiffs complained to the defendant of not receiving adequate rest.

44. On January 25, 1946, Captain C. D. Nicholson informed the committee members that the defendant's pay policy had been established and that such policy was that each plaintiff would be paid for a minimum of 12 hours per day, with appropriate overtime payment at one and one-half times his regular rate for each hour over eight (8) credited to or worked by him in any twenty-four hour period, and for each hour over forty (40) in any work week.

45. January 31, 1946, the committee members representing the plaintiffs, met with Captain Nicholson, representing the defendant, who told them that an arrangement could be made by which the plant guards would be on duty twelve (12) hours and off duty twelve (12) hours, and that they could leave the plant during their off duty hours through the institution of shift changes on a staggered basis. The committee decided that the plant guards would continue to work the same schedule originally agreed upon of eight (8) hours on duty and eight (8) hours off duty. This agreement of the committee was approved by the defendant.

46. On occasions during the period from January 18 to February 9, 1946, plaintiffs worked, by request, hours in excess of those scheduled by agreement.

47. During the period from January 18 to February 9, 1946, the plaintiffs' off duty hours averaged 10-1/4 hours per 24-hour period, and they were paid (including payment for hours credited over 40 hours per week at one and one-half times their regular rates of pay) for all except an average of 7-3/4 hours per 24-hour period. On a day a plaintiff worked only eight (8) hours, he had a total of sixteen (16) hours

available to him for sleeping, eating, recreation, and other personal activities.

## Conclusions of Law.

1. All of the plaintiffs are employees of the defendant within the meaning of the Fair Labor Standards Act of 1938.

2. All of the plaintiffs are engaged in interstate commerce within the meaning of the Fair Labor Standards Act of 1938.

3. All of the time spent by each of the plaintiffs on the premises of the defendant from January 18, 1946 to February 9, 1946, except for such periods as they may have been absent therefrom by special permission of their officers, was work performed by the plaintiffs for the benefit of the defendant within the meaning of the Fair Labor Standards Act of 1938.

4. Each of the plaintiffs are entitled to be paid for twenty four (24) hours work per day or a total of one hundred sixty eight (168) hours per work week for all of the time the plaintiffs were on defendant's premises from January 18, 1946 to February 9, 1946, (except such time as they may have been absent from the defendant's premises with the permission of defendant's officers), at their regular rate of pay at which each of them was employed for the first forty (40) hours in each of said work weeks, and at a rate of not less than one and one-half times the regular rate at which each of said plaintiffs were employed for all work in excess of forty (40) hours per work week.

5. Defendant has not paid each of the plaintiffs for twenty-four (24) hours per day or a total of one hundred sixty eight (168) hours per work week for all of the time plaintiffs were on defendant's premises from January 18, 1946 to February 9, 1946, less such times as they were absent from the defendant's premises with the permission of defendant's officers, at their regular rate of pay at which each of them was employed for the first forty (40) hours in each of said work weeks, and at a rate of pay not less than one and one-half times the regular rate at which each of said plaintiffs were employed for all work in excess of forty (40) hours per week.

6. Each of the plaintiffs are entitled to recover, of the defendant, their unpaid overtime compensation, as aforesaid and an additional equal amount as liquidated damages.

7. Counsel for plaintiffs are entitled to a reasonable attorneys' fee to be allowed by the court and to be paid by the defendant.

8. That a judgment in favor of each of the plaintiffs named, shall be entered against the defendant by the Court in accordance with these findings and conclusions upon counsel for the parties submitting agreed upon calculations as to the respective sums due each plaintiff, or failing such an agreement after the sum due each respective plaintiff, shall have been determined by the court upon further hearing, or by reference to a special master, costs to be paid by defendant.