José Guillermo Deyá y Otros, Santiago Ramos, querellantes y recurrente el último, *v.* Otis Elevator Co., querellada y recurrida; Otis Elevator Co., peticionaria, *v.* Tribunal Superior de Puerto Rico, Sala de San Juan, Hon. M. A. Velázquez Rivera, Juez, demandado.

*Números:* R-62-133, C-62-56      *Resueltos:* 22 de enero de 1965

*Víctor M. Bosch,* y *Roberto Armstrong, Jr.,* abogados de los obreros; *Beverley, Castro & Rodríguez Lebrón,* e *Iván Reichard,* abogados de la Compañía.

Sala integrada por el Juez Asociado Señor Blanco Lugo como Presidente Accidental de Sala y los Jueces Asociados Señores Dávila y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

En *Sucn. Meléndez* v. *Central San Vicente*, 86 D.P.R. 398 (1962), tuvimos la ocasión de formular una norma general para determinar la compensabilidad del tiempo de espera. Señalamos que la solución depende de una consideración en conjunto de las circunstancias de cada caso en particular, pero que en gran medida dependía de: (1) el grado de libertad para dedicarse a actividades personales durante el período de inactividad en que el empleado está sujeto a ser llamado para prestar servicios; (2) el número de horas consecutivas durante las cuales el empleado está sujeto a ser llamado; y, (3) el beneficio que representa la espera para el patrono o al negocio de éste. Los recursos sometidos a nuestra consideración requieren la aplicación de la norma dentro de la modalidad conocida como "tiempo sujeto a ser llamado" (*on call time*). Por vía de ilustración, y por la fuerza persuasiva que tiene la experiencia administrativa, transcribimos las disposiciones del reglamento promulgado por el Administrador federal de la Ley de Horas y Salarios, 29 C.F.R. 1949 (Supl. 1962) sec. 785.17, ([1]) que leen:

"Un empleado que viene obligado a permanecer en el local del patrono o muy cerca de éste esperando ser llamado, de tal suerte que no puede usar efectivamente ese período para fines personales, está trabajando mientras 'espera ser llamado'. Un empleado que no viene obligado a permanecer en el local del patrono, pero simplemente viene obligado a dejar constancia en

---

([1]) Conservó idéntica redacción en el suplemento de 1964.

Parece aconsejable que bajo la facultad que se le confiere al Secretario del Trabajo por el Art. 17 de la Ley Núm. 379 de 15 de mayo de 1948, 29 L.P.R.A. sec. 286, se adopten los reglamentos necesarios para la determinación. de las horas trabajadas como parte de la jornada diaria, especialmente en cuanto a tiempo de espera, para dormir, descansar, etc. Véase, 29 C.F.R. § 785.5 *et seq.*

su hogar o con los funcionarios de la empresa sobre el lugar en donde puede ser localizado, no se encuentra trabajando mientras espera tal llamada."

Nos ocupan las reclamaciones de los empleados Santiago Ramos y Guillermo Deyá contra la Otis Elevator Co., empresa que se dedica a la venta e instalación de ascensores en establecimientos comerciales, industriales y residenciales. Como parte de los servicios que presta a sus clientes tiene una división para el mantenimiento y reparación de las distintas unidades. Generalmente estos servicios se prestan durante las horas laborables—de 8:00 A.M. a 5:00 P.M.—pero en el caso de establecimientos que operan durante todo el día, se ofrece un servicio de emergencia fuera de las horas regulares. En tales casos el contrato estipula una suma mayor para cubrir los gastos adicionales que ello ocasiona.

El tribunal de instancia dirimió el conflicto fundamental de la prueba sobre la naturaleza de la prestación de servicios y, en efecto, descartó la versión de la demandada de que la labor requerida a los querellantes que pasaremos a reseñar, era puramente voluntaria, al extremo de que podían desatender las llamadas de emergencia sin que ello conllevara medidas disciplinarias. Con esta proposición fundamental en mente, veamos la relación del caso en las palabras del magistrado que entendió en el caso:

"El querellante Santiago Ramos comenzó a prestar servicios a la querellada desde el 11 de junio [debe ser julio] de 1949. En esa fecha se le nombró con carácter de aprendiz mecánico en la empresa. Pocos meses después la compañía le ascendió a inspector de ruta de elevadores. Su horario regular de trabajo se extendía desde las ocho de la mañana hasta las cinco de la tarde. Ramos desempeñaba las tareas de reparación que le eran asignadas. Al terminar su trabajo en la unidad que necesitaba reparación, tenía la obligación de llamar por teléfono a las oficinas centrales donde le encomendaban la próxima labor del día. El querellante se trasladaba entonces a la nueva dirección que le era notificada y así continuaba trabajando hasta la hora de salida, que era regularmente a las cinco de la tarde.

"Luego de un año y medio realizando su labor en las circunstancias apuntadas Ramos fue llamado a consulta por el Gerente Interino de la compañía, señor Esteves. Este le informó que la corporación haría instalar un teléfono en la residencia del querellante, cuyo número estaría consignado en la guía telefónica a nombre de la 'Otis Elevator Company'. La idea que el Gerente comunicó a Ramos era al efecto de que durante el período comprendido entre las cinco de la tarde y las ocho de la mañana del siguiente día los clientes de la compañía que estaban acogidos al servicio de emergencia durante horas no laborables pudieran llamar a ese número telefónico instalado en la residencia de Ramos y obtener el servicio de reparación que fuera menester. El querellante aceptó la encomienda. Como resultado, la corporación hizo instalar el teléfono en la forma indicada, pagando la tarifa correspondiente a la Compañía Telefónica.

"El sistema funcionaba en forma tal que Ramos desempeñaba sus labores regulares en la empresa desde las ocho de la mañana a las cinco de la tarde de cada día. A esa hora se trasladaba a su hogar donde permanecía realizando las actividades usuales, tales como leer, escuchar la radio, conversar con familiares y amigos, hacer tareas de reparación de utensilios caseros, ingerir sus comidas, dormir y otras similares. Cuando algún cliente de la empresa llamaba urgiendo la prestación de servicios de emergencia en uno de los elevadores instalados, Ramos atendía la comunicación y concurría al lugar indicado, no importa la hora en que surgiera la emergencia. La prueba aportada durante la audiencia fue al efecto de que tales llamadas y la consiguiente labor de reparación no eran muy frecuentes, oscilando entre tres y cuatro ocasiones al mes. Era convenido entre el querellante y la querellada que cuando surgían emergencias de esta índole Ramos debía rendir un informe escrito relatando los pormenores del caso, y a base de tal información, la compañía le pagaba por el tiempo efectivamente invertido en la reparación y el período de tiempo invertido en trasladarse desde su casa al lugar de la emergencia y luego de vuelta al hogar. La compensación pagada en estas ocasiones se computaba a base del tipo fijado para el pago de horas extraordinarias de labor. Durante este período Ramos estaba impedido de abandonar su hogar durante intervalos de tiempo que confligieran con las responsabilidades asumidas. Cuando lo hacía, encomendaba a su esposa la atención del teléfono en caso necesario y dejaba nota del lugar en que sería posible

localizarlo. Esta norma regía aun durante los días sábado y domingo de cada semana, así como los días feriados en que el querellante no desempeñaba labores dentro del horario regular con la empresa.

"A fines del año 1952 ocurrió un cambio en la gerencia de la corporación querellada. El señor Campbell comenzó a desempeñar las funciones de Gerente en Puerto Rico. El querellante planteó a éste sus objeciones a las condiciones de trabajo prevalecientes. Como resultado, se concedió a Ramos un período de doce horas al mes durante el cual no vendría obligado a permanecer en su hogar en espera de las llamadas de emergencia. Se fijó uno de los domingos del mes, en el período comprendido entre las ocho de la mañana y las ocho de la noche, en el cual Ramos no tendría que hacer la guardia acostumbrada. Así continuaron las cosas hasta que un supervisor llegado de Estados Unidos en misión especial, apellidado Fucol, ordenó que se relevara al querellante de su obligación de tener instalado un teléfono de la empresa en su residencia. Como consecuencia de ello, se desconectó el teléfono de referencia y Ramos continuó realizando sus tareas para la empresa sólo durante las horas regulares de trabajo de la compañía.

"En el mes de septiembre de 1954 la gerencia de la compañía en Puerto Rico fue encomendada a David Moier. Este llamó al querellante Ramos allá para el mes de diciembre de 1955 y le notificó que la corporación adoptaría un nuevo sistema para atender el problema de los servicios a prestarse en horas no laborables. Moier explicó que la empresa había contratado con una agencia de servicios, denominada 'Telephone Answering Service and Radio Call' que proveería a los empleados de la querellada un medio para ser localizados por los clientes necesitados de servicio en las horas no laborables. Al adoptarse el sistema, se estableció un registro de mecánicos, que se turnaban entre sí, y a quienes se les entregaba un pequeño aparato trasmisor y receptor de radio [era solamente un receptor], del tamaño de una cajetilla de cigarrillos. El método que se seguía era el de que el mecánico de turno, luego de terminar su horario regular de trabajo, llevaba consigo el aparato de radio, y venía obligado a hacerlo funcionar—pegado junto al oído—en intervalos de diez a quince minutos a fin de comunicarse con las oficinas del 'Telephone Answering Service'. En caso de que hubiese alguna llamada de emergencia a partir de los quince minutos de la llamada

anterior, la agencia así lo comunicaba por radio al mecánico, quien entonces tomaba sus herramientas de trabajo y se dirigía al lugar en que sus servicios eran requeridos. Los mecánicos de turno venían obligados a tener consigo y hacer funcionar a intervalos de quince minutos el mencionado trasmisor [se refiere al receptor] de radio solamente hasta las once de la noche de cada día laborable puesto que, a partir de esa hora, la Telephone Answering Service no prestaba sus servicios. Durante el sábado, el domingo y los días feriados los mecánicos de turno en la guardia del 'radio call' tenían la responsabilidad de hacer funcionar el trasmisor en los intervalos de tiempo ya mencionados en las horas comprendidas entre las ocho de la mañana y las once de la noche. Nada impedía que los mecánicos en este tipo de tarea realizaran las ocupaciones habituales en su hogar o se trasladaran de un sitio a otro con sus trasmisores, excepto con dos limitaciones de importancia; a saber: no podían abandonar el área metropolitana, ni podían participar en fiestas en las cuales ingirieran bebidas alcohólicas ya que se suponía estuvieran en condiciones físicas de hacer adecuadamente la labor de reparación de emergencia donde y cuando se les requiriera. Es de notar, además, que el trasmisor no funciona normalmente en habitaciones cerradas, razón por la cual el mecánico de turno no debía asistir a un cinematógrafo, a una iglesia, a un salón de clases nocturnas, u otro lugar similar a no ser que estuviere dispuesto a abandonar el local y salir a campo abierto a intervalos de quince minutos a fin de establecer la comunicación de rigor. Los mecánicos turnaban su guardia semanalmente y recibían paga—computada a base de horas extras—por aquellas ocasiones en que real y efectivamente reparaban algún elevador, incluyendo el tiempo invertido en trasladarse al lugar de la reparación.

"Para complementar la labor de los mecánicos de turno al adoptar el sistema de 'radio call', el gerente de la empresa notificó a Ramos que era necesario que se instalara nuevamente un teléfono de la compañía en la residencia de éste. De esta manera, todo cliente con derecho a recibir el servicio de emergencia podía llamar al número indicado en la guía telefónica a nombre del patrono, entre las once de la noche y las ocho de la mañana del día siguiente, horas durante las cuales no funcionaba el 'radio call'. Moier indicó a Ramos que, conjuntamente con el teléfono de su casa, se instalaría otro igual en la residencia de otro empleado, de nombre Ismael Rivera, a fin de que ellos dos se

turnaran el período de guardia semanalmente. Desde luego, ambos estaban relevados de su obligación de estar a la espera de llamadas telefónicas durante los sábados, domingos y días feriados hasta las once de la noche porque los mecánicos que funcionaban a base del sistema de 'radio call' realizarían tal labor. Ramos aceptó la encomienda. De ahí en adelante su período de guardia se limitaba a dos semanas al mes, y sólo durante las horas de la noche. El teléfono continuó instalado en esta forma en la residencia de Ramos, aun cuando su compañero de guardia luego fue sustituido por el mecánico Portela y más tarde por Cruz Fuentes. En el año 1961 Ramos cesó en su empleo.

"Por su parte, el querellante José Guillermo Deyá comenzó a prestar servicios para la corporación demandada en el 1955, año en el cual se estableció el sistema de radio call. La prueba aportada durante el juicio fue al efecto de que fue uno de los mecánicos asignados a desempeñar labores bajo el sistema de 'radio call'; que llevó a cabo sus labores bajo tal sistema en la forma descrita precedentemente y que se le compensó por su horario regular de trabajo pero no se le pagó suma alguna por razón de haber estado de turno en espera de llamadas de emergencia. Desde luego, en aquellas ocasiones en que real y efectivamente llevó a cabo alguna tarea de reparación de emergencia en el período comprendido entre las cinco de la tarde y las once de la noche, rindió el informe de rigor y recibió la paga equivalente al tiempo invertido en la reparación, incluyendo el tiempo de viaje desde el lugar en que se encontraba al recibir la llamada hasta el lugar indicado."

Otros elementos de la prueba que es necesario tener en cuenta indican que Ramos se retiraba a descansar cerca de las once de la noche y que a su juicio "cuando uno no está de turno estaba más tranquilo, podía hacer las cosas mejor y con más provecho para mí mismo." Deyá, por su parte, declaró que el hecho de que tuviese que hacer funcionar el receptor a intervalos de quince minutos le impedía realizar labores en el hogar.

El tribunal de instancia determinó que Deyá estaba trabajando para el patrono en las horas en que estaba de turno de las cinco de la tarde a las once de la noche de determina-

dos días fundándose en que (a) el período en que éste venía obligado a hacer funcionar el receptor de radio a intervalos de quince minutos era de mayor provecho para la empresa querellada; (b) el querellante estaba efectivamente restringido en sus actividades personales; (c) la empresa recibía una compensación adicional por el servicio de emergencia fuera de las horas laborables. (²) Por otro lado, desestimó la reclamación de Ramos aduciendo que (a) no se requería que éste realizara ninguna actuación afirmativa; (b) durante el período de espera disfrutaba de un grado de libertad personal que le permitía dedicarse a sus propias actividades y menesteres.

■ Como hemos esbozado anteriormente no existe una norma fija para aplicar en estos casos. Deben considerarse las circunstancias en conjunto y de ellas tratar de establecer con razonable certeza si la espera constituye parte de la jornada de trabajo. Esto es particularmente difícil cuando, como en el presente caso, dentro de un determinado marco de hechos concurren factores que señalan ambas conclusiones. Hemos examinado detenidamente los precedentes citados por las partes y otros que hemos encontrado, y con excepción de contener una reiteración de la doctrina general que expusimos en *Sucn. Meléndez* v. *Central San Vicente*, supra, no son de gran ayuda para resolver la presente controversia. A ningún resultado práctico conduciría su análisis debido a la variedad de circunstancias que presentan. (³) Sin embargo, es con-

---

(²) La única prueba que se ofreció por el particular no sostiene que la compañía derive un beneficio adicional por la prestación de este servicio de emergencia, ya que la cantidad mensual estipulada en los contratos ha sido determinada considerando el número promedio de servicios por ascensor que se efectúan durante un año. El costo ha sido prorrateado entre los distintos suscriptores y responde a la incidencia general y no a la de cada cliente en particular.

(³) *Skidmore* v. *Swift & Co.*, 323 U.S. 134 (1944) ; *Armour & Co.* v. *Wantock*, 323 U.S. 126 (1944) ; *Aeromotive Metal Products Inc.* v. *Wirtz*, 312 F.2d 728 (9th Cir. 1963) ; *Mitchell* v. *Turner*, 286 F.2d 104 (5th Cir. 1960) ; *Mitchell* v. *Greinetz*, 235 F.2d 621 (10th Cir. 1956) ; *Van Dyke* v. *Bluefield Gas Co.*, 210 F.2d 620 (4th Cir. 1954) ; *Handler* v. *Thrasher*,

veniente mencionar el siguiente pasaje, que por vía de *dictum*, aparece en *Dumas* v. *King*, 157 F.2d 463, 466 (8th Cir. 1946): "No requiere seria consideración la contención de que el tribunal como cuestión de hecho ha debido determinar que la jornada de King se extendió durante las 24 horas del día, ya que se había convenido que podía ser llamado de su hogar a la planta en cualquier momento en caso de que ocurrieran desperfectos en la maquinaria. La evidencia demuestra que estaba en libertad de ir y venir a su arbitrio durante este alegado período de espera, sólo que se suponía informara a la empresa el lugar en donde podía localizársele si surgía una emergencia." Y en *Super-Cold Southwest Co.* v. *McBride*, 124 F.2d 90 (5th Cir. 1941), se sostuvo que un empleado que meramente estaba obligado a dejar un número de teléfono o a informar el lugar en donde se encontraba no estaba trabajando dentro del significado de la Ley Federal de Horas y Salarios. Véase, P-H Lab. Rel. Serv. § 9129.2.

■ En cuanto a Deyá se refiere es innegable que el sistema de trabajo le imponía restricciones efectivas a su ac-

191 F.2d 120 (10th Cir. 1951); *Republican Pub. Co.* v. *American Newspaper Guild*, 172 F.2d 943 (1st Cir. 1949); *Central Missouri Tel. Co.* v. *Conwell*, 170 F.2d 641 (8th Cir. 1948); *Bridgeman* v. *Ford, Bacon & Davis*, 161 F.2d 962 (8th Cir. 1947); *Bell* v. *Porter*, 159 F.2d 117 (7th Cir. 1946); *Bowers* v. *Remington Rand*, 159 F.2d 114 (7th Cir. 1946); *Rokey* v. *Day & Zimmermann*, 157 F.2d 734 (8th Cir. 1946); *Perry* v. *George P. Livermore, Inc.*, 165 S.W.2d 782 (Texas 1942); *Hernández* v. *Ethyl Corporation*, 83 So.2d 150 (La. 1955); *Remisiewski* v. *Parodi Cigar Co. of New York*, 64 A.2d 93 (N.J. 1949); *Wirtz* v. *Healy*, 227 F.Supp. 123 (Ill. 1964); *Arthur* v. *K. D. Emrick Well Servicing Company*, 209 F.Supp. 491 (Okla. 1962); *Adkins* v. *Campbell Brown & Company*, 189 F.Supp. 553 (W. Va. 1960); *Wright* v. *Carrigg*, 174 F.Supp. 27 (S.C. 1959); *Shupe* v. *Day*, 113 F.Supp. 949 (Va. 1953); *Campbell* v. *Jones & Laughlin Steel Corporation*, 70 F.Supp. 996 (Pa. 1947); *Eustice* v. *Federal Cartridge Corporation*, 66 F.Supp. 55 (Minn. 1946); *Bohn* v. *B & B Ice & Coal Co.*, 63 F.Supp. 1020 (Ky. 1946); *Walling* v. *Bank of Waynesboro, Ga.*, 61 F.Supp. 384 (Ga. 1945); *Buckner* v. *Armour & Co.*, 53 F.Supp. 1022 (Texas 1942); *Thompson* v. *Loring Oil Co.*, 50 F.Supp. 213 (La. 1943); *Travis* v. *Ray*, 41 F.Supp. 6 (Ky. 1941). Véanse además, Anotación, *What is considered as working time within contemplation of overtime provisions of Federal Fair Labor Standards Act*, 89 L.Ed. 130 (1944), y 33 Va. L. Rev. 44, 58–60 (1947).

tividad personal, sin que ello quiera significar que era un cautivo de las obligaciones del empleo. Por el contrario, aunque Ramos tenía ciertas limitaciones, éstas eran mínimas y podía realizar las actividades y gestiones a las que se dedica un empleado después que ha rendido la jornada diaria de trabajo, con excepción de los sábados, domingos y días feriados, ocasiones en que su permanencia continua en el hogar atento al recibo de las llamadas de emergencia o en un lugar accesible en caso de ser llamado en la forma que aparece de la prueba no es congruente con el patrón normal de conducta del hombre razonable. Como la prueba demostró que las llamadas no eran frecuentes—un promedio de 3 ó 4 al mes— Ramos ordinariamente disfrutaba de un período de descanso normal de ocho horas. Este período no se incluirá como parte de la jornada de trabajo, ni una hora adicional que puede comprender el tiempo para tomar comidas, asearse, etc. En su justa perspectiva puede afirmarse que el trabajo realizado por Deyá y por Ramos durante los sábados, domingos y días feriados representaba un beneficio apreciable para el negocio de la querellada en las relaciones con sus clientes y que el provecho que recibían los reclamantes—el pago por la labor de reparaciones efectivamente realizadas—era insignificante. El factor del número de horas consecutivas durante las cuales el empleado estaba sujeto a ser llamado no juega un papel decisivo en este caso.

*En conclusión, Deyá debe ser compensado en la forma dispuesta por el juez a quo, y por tanto, se anulará el auto expedido para revisar la resolución del tribunal recurrido. En cuanto a Ramos, se modificará la sentencia dictada conforme a los términos de esta opinión y se devolverá el caso para ulteriores procedimientos.*