SHUPE et al. v. DAY et al.

Civ. No. 355.

United States District Court
W. D. Virginia, Abingdon Division.
July 17, 1953.

---

James E. Drinkard, and Bradley Roberts, of Bristol, Va., for plaintiffs.

Fred B. Greear, of Norton, Va., for defendants.

BARKSDALE, District Judge.

This is an action instituted by Caston Green Shupe and Beartie, his wife, against Roy Day and E. M. Day, Jr., trading and doing business as Day Lumber Company, under the provisions of the Fair Labor Standards Act, as amended 29 U.S.C.A. § 201 et seq. Plaintiffs allege that they were employed as watchmen to watch, guard and protect the properties of defendants who were conducting a sawmill operation in Wise County, Virginia, at the joint salary of $100 per month while the mill was in operation and $75 per month while the mill was not in operation, that from March 1,

1951, through July 31, 1952, plaintiffs and defendants were engaged in interstate commerce or in the production of goods for commerce, or in employment that had a close and immediate relationship and was directly essential for production of goods for commerce, and that therefore they were subject to the provisions of the Fair Labor Standards Act. Plaintiffs demand judgment for what they allege are unpaid wages at the minimum rate prescribed by the Act, together with overtime and liquidated damages, for Caston Green Shupe in the sum of $10,145, for Beartie Shupe in the sum of $10,030, together with an attorney's fee, interest and costs.

This action having been tried on June 30,—July 1, 1953, by the court without a jury, the court finds the facts and states separately its conclusions of law as follows:

### Findings of Fact.

At all times pertinent to this controversy, Roy Day and E. M. Day, Jr., partners trading as Day Lumber Company, were engaged in timbering and sawmilling in Wise County, Virginia, and had been engaged in the lumber business for many years previously. During all their years of sawmilling, defendants found it desirable to locate their sawmills close to some human habitation. This was for the reason that they found that vandalism and depredations were less likely to occur at a mill near which people resided than at a mill remote from human habitation. In many of its sawmilling operations, defendants found it convenient to locate their mills close to people's homes, some of which people were their employees and some were not. In at least two instances, including the operation here in question, the sawmills were located in remote places, so defendants built shacks near the mills and employed people to live in them. In the instances where the mills were located near the homes of persons not employed by defendants, no compensation was paid to the residents of these homes. Defendants carried no insurance on their sawmills, and were therefore under no contractual or legal obligation of any kind to employ watchmen or guards.

During all times here pertinent, defendants were engaged in timbering and sawmilling on Black Mountain in Wise County. The timber at this location was owned by Virginia Coal & Iron Company, and defendants conducted their operations under a contract with this company. In this operation, defendants sawed some building lumber, and some lumber for use in mining operations. Defendants cut some timber for this sawmill in Kentucky and some in Virginia, and sold and delivered some lumber to points in Tennessee as well as other points in Virginia. The mines for which the mining lumber was manufactured, were engaged in interstate commerce. I find as a fact that defendants were engaged in interstate commerce and in the production of goods for commerce.

At the beginning of this operation, defendants built a shack near their sawmill on Black Mountain, as there was no residence within several miles of this sawmill. On and before February 28, 1951, this shack had been occupied by one Dollarhide, an employee of defendants, and for living in the shack near the sawmill, he was paid $75 a month when the mill was not in operation and $100 a month while the mill was in operation. Some time in February, 1951, plaintiff, C. G. Shupe, approached defendants and asked if he might move into this shack. At that time plaintiff, C. G. Shupe, was approximately seventy-four years of age, was a retired miner, had done no work for the past two years, and the plaintiff, Beartie Shupe, was also old and in poor health. Their only means of subsistence was an old age pension of $30.80 per month. They were seeking assistance from the United Mine Workers' Relief Fund, but, so far, their efforts had been unsuccessful. They were behind in their rent and threatened with eviction. Defendants told them they had no shack available, but that if the then occupant of the Black Mountain shack should leave, they would let him move in and pay him the same amount which they were then paying to their employee who lived there. Dollarhide, the employee then living in the shack,.

decided to move, so, on February 28, 1951, defendants went to plaintiffs' home and told C. G. Shupe that he could move into the shack and live there while the sawmill operation continued, and for living there they would pay him $75 per month while the mill was not in operation, and an additional $25 per month while the mill was in operation, as compensation for cleaning sawdust and bark from under and around the cut-off saw. Defendants wished to transport the plaintiffs and their belongings to the shack by truck and transport Dollarhide and his belongings away from the shack on the same trip, so the move was made the following day. The plaintiffs remained in the shack on Black Mountain until approximately July 30, 1952. During this time, plaintiffs were never carried on defendants' books as hourly-paid employees but were paid the sum of $75 per month while the mill was not in operation and an additional $25 a month while the mill was in operation, the additional sum being compensation for cleaning around the mill. Plaintiff, Beartie Shupe, was never employed by defendant to do anything. The only circumstance which gives color to her contention that she was employed, is that, for a number of months, part of the monthly compensation was paid by defendants to her. Such payment was made to Beartie Shupe at the request of C. G. Shupe to enable him to defraud the Social Security Board. C. G. Shupe told defendants that, under the Social Security Law, if he earned as much as $50.00 per month, he would not be entitled to continue to draw his old age compensation; therefore, for a number of months, at Shupe's solicitation, the defendants paid C. G. Shupe $49.00 per month and the balance to Beartie Shupe. The only duty or work required by defendants of C. G. Shupe was the cleaning around the mill, which was a task requiring not more than one and a half hours per day. The $25 per month compensation paid Shupe for this work was in excess of the minimum required by the Fair Labor Standards Act.

It is true that, on defendants' books, the payments to plaintiffs bore the notation, "Watching at the Mill", the pay checks bore the same notation, and defendants included the amounts paid to the Shupes in their expenses of operation for income tax purposes. However, I find as a fact that other than cleaning under the mill, plaintiff, C. G. Shupe, was employed to do nothing other than to live in the shack. He was not employed as a watchman or guard, he was not required to be ready to serve in any capacity, nor to act in a stand-by capacity. During all the time he occupied the shack, plaintiff, C. G. Shupe, was free to go and come as he pleased, no physical or mental exertion was required of him, neither his movements nor his conduct were controled, nor was anything required of him by defendants. C. G. Shupe went and came as he pleased. He frequently went to Appalachia and other nearby towns, on many occasions staying all day. On his own account, and for his own benefit, he profitably bought and sold lumber, he helped contract haulers load their trucks, and was by them paid, he picked and sold thirty dollars worth of huckleberries, and collected and sold considerable quantities of waste or cull wood which was given him by defendants.

### Conclusions of Law.

█ It is quite true that a watchman or guard employed in an operation engaged in commerce, is included within the coverage of the Fair Labor Standards Act. Skidmore v. Swift, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124; Walton v. Southern Package Corp., 320 U.S. 540, 64 S.Ct. 320, 88 L.Ed. 298; Bennett v. V. P. Loftis Co., 4 Cir., 167 F.2d 286; Reliance Storage & Inspection Co. v. Hubbard, D.C., 50 F.Supp. 1012. However, in these and all other "watchman" cases with which I am familiar, the situation was entirely different from the situation here presented. In most of these cases, the watchmen punched time clocks, and in all of them, they had regular hours, regular rounds, specific duties, and were definitely under the control of their employers. No such situation is here presented. It is my conclusion that the "watchman" cases have no application to the situation here.

It is quite true that the Fair Labor Standards Act was enacted for the protection of

the humble. However, it is inconceivable to me that the Fair Labor Standards Act was ever meant to include a situation such as here presented. Plaintiffs were more than fairly treated by the defendants, and this controversy would never have arisen, but for the fact that Beartie Shupe became incensed because defendants withheld certain taxes which they were by law required to withhold.

The only case which has been cited to me in which the facts are at all similar to the facts here, is the case of Perry v. George P. Livermore, Inc., Tex.Civ.App., 165 S.W.2d 782, 152 A.L.R. 1038. There, the plaintiff was employed by a well-drilling contractor to live on premises adjacent to the employer's stacked machinery, and the only other service rendered was the occasional drilling of water from the rig in cold weather. Subsequently, he was required to live on other premises and pump the oil well thereon, which took no more than four or five hours each day, and it was not shown that he was required to be present at all times during the pumping process or what time he actually spent in personal attendance or manual labor in this process. It was held that the employee did not perform personal services in excess of the maximum allowed by the Act, and was not entitled to overtime compensation.

In Culkin v. Glen L. Martin Neb. Co., D.C., 97 F.Supp. 661, 672, it was said:

"Work has been defined, for the purposes of the Fair Labor Standards Act, as meaning physical or mental exertion whether burdensome or not—controlled or required by the employer and pursued primarily for the benefit of the employer and his business."

It is my conclusion that Shupe did not come within this definition. No physical or mental exertion was required of him (other than cleaning away the sawdust for which he was amply compensated), and with this exception, nothing that he did was controlled or required by the employer.

As was said in Armour & Co. v. Wantock, 323 U.S. 126, 133, 65 S.Ct. 165, 168, 89 L.Ed. 118:

"Of course an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety to the employer's property may be treated by the parties as a benefit to the employer. *Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case.*" (Italics mine.)

It seems to me that the last sentence of this quotation fits our situation like a glove. Under all the circumstances of this case, I do not feel any doubt, and therefore conclude, that Caston Green Shupe's time was not spent predominantly for his employer's benefit, but was definitely and profitably spent for the benefit of Shupe himself.

Specifically I find:

(1) That this court has jurisdiction of this action;

(2) That defendants were engaged in interstate commerce and the production of goods for commerce, and were therefore within the coverage of the Fair Labor Standards Act;

(3) That the plaintiff, Beartie Shupe, was never employed at all by defendants; and

(4) That Caston Green Shupe was employed specifically to clean sawdust and dust from the mill, for which he was paid more than the minimum required by the Act, and to live in defendant's shack, which latter situation is not within the coverage of the Act.

It therefore follows that an order will be entered dismissing this action at the costs of the plaintiffs.