**Levi WRIGHT, Plaintiff,**

v.

**W. H. CARRIGG, Defendant.**

**Civ. A. No. 6932.**

United States District Court
E. D. South Carolina,
Charleston Division.

June 18, 1959.

28

Elliott T. Halio, Sam I. Feldman, Charleston, S. C., for plaintiff.

Julian S. Wolfe, Orangeburg, S. C., for defendant.

WILKIN, District Judge.

This cause came on for trial and was submitted on the pleadings, evidence, argument and briefs.

Henry T. Gaud, Esquire, having withdrawn from the case, Julian S. Wolfe, Esquire, was substituted and appeared as counsel for defendant.

There was no dispute as to the basic facts. The defendant was engaged, by contract with the U. S. Post Office Department, in transporting by motor vehicles mail moving in interstate commerce between Charleston, South Carolina, and other places. He hired employees who drove his mail trucks on regular schedules over defined routes.

The plaintiff was employed by the defendant for 18 weeks, from April 14 to August 16, 1958, to drive a truck over a course which included North Charleston Station, Summerville, St. George, Branchville, Bamberg, and Denmark, South Carolina, and pick up and deposit mail on railroad trains at certain stations. There was no written agreement. He left Charleston about ten o'clock at night and returned the next morning, working seven days a week. The course could be covered in about four or four and one half hours, but the time spent in waiting for trains, (1 to 3 hours), increased the daily hours in service. No record of daily hours was kept by employee or employer.

It was agreed by counsel that the essential issue was whether the plaintiff was entitled to wages for the time spent in waiting for trains, when not engaged actively in work for the defendant.

Plaintiff was promised and paid $30 a week, a total of $540. Defendant took the plaintiff over the route and demonstrated the time spent in driving and the time spent waiting for trains.

Defendant testified that he told plaintiff that time spent in waiting for trains would not be compensated. Plaintiff denied that he was so informed. He admitted however that he carried a blanket and pillow and slept in the truck while

waiting. Defendant's wife, who acted as secretary and bookkeeper for her husband, testified that all other truck drivers were paid for active time only, and that plaintiff was so informed.

Counsel for plaintiff contended that, regardless of such testimony, plaintiff was entitled by law to the minimum wage for the full time between leaving and arriving back at Charleston. The case was submitted on the admitted facts and the law.

■ The court finds that the plaintiff's employment was subject to the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. Mitchell v. Postal Service, Inc. (Steinmetz), D.C.Ga.1959, 175 F.Supp. 761.

■ In view of the facts that plaintiff was "on duty" in defendant's service; was in charge of defendant's truck; could not have found other employment at such hours of the night; and that proper sleeping conditions were not available, the court finds that the time spent waiting for trains was compensable under the Act. Skidmore v. Swift & Co., 323 U.S. 134, 137, 65 S.Ct. 161, 89 L.Ed. 124; Armour & Co. v. Wantock, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118.

In consideration of all the evidence, the mileage of the route, the services required, and circumstances, the court finds that a reasonable and just estimate of the average daily time for which plaintiff should have been paid is seven hours.

The court further finds that the defendant acted in good faith, with no intent to violate or evade the law. He did not know that the Fair Labor Standards Act applied to contract mail carriers. And indeed it was not judicially determined that the Act did so apply until March 1959—after the employment had terminated. Mitchell v. Postal Service, Inc. (Steinmetz), supra, 29 U.S.C.A. § 211.

As the law is applied to the facts it leads to the following calculations:

Seven hours a day and seven days a week equals 49 hours a week

| | | |
|---|---|---|
| 40 hours at minimum wage | = | $ 40.00 |
| 9 hours at overtime wage | = | 13.50 |
| Weekly lawful wage | = | 53.50 |
| Number of weeks | | 18 |
| | | 42800 |
| | | 5350 |
| Total due | | 963.00 |
| Amount paid | | 540.00 |
| Balance due | | 423.00 |
| Interest | | 25.38 |
| Amount due, date of judgment | | $448.38 |

■ Since defendant acted in good faith, without unlawful intent or any reason to believe that he was violating the law, and in strict compliance with the agreement between him and plaintiff, no award of liquidated damages or attorney fees is made. Since the plaintiff's recovery is much more than he agreed to accept, and did willingly accept, he can afford to, and should, pay his attorneys a reasonable fee.

This opinion may serve as findings of fact and conclusions of law. Enter— Judgment for plaintiff against defendant for $448.38 and costs.

NOTE. Although no further comment is required by the determination of this case, still I feel constrained to express some impressions I have gained from the judicial administration of the F.L.S. A. and other price-fixing enactments. While their objective may be commendable, their enforcement produces undesirable results. They tend to restrict freedom of contract and destroy respect for the obligation of contract. They repress free enterprise, initiative, independence and integrity. Their general effect is federalistic, socialistic, and paternalistic. They infringe on individual rights and States' rights; and, by ignoring the varying circumstances and conditions of persons and communities, they impose on our economic and political life a strait jacket of arbitrary commands.

The uniform enforcement of wage- and price-fixing enactments would require such an extensive police force or "Gestapo" that our government has been unwilling to assume it. It therefore farms out to individuals the enforcement, and grants them a share in the recoveries obtained. A plaintiff (regardless of his contract) who proves he has been paid less than the minimum wage provided by the F.L.S.A. is granted not only a dollar an hour for regular time and a dollar and a half an hour for overtime but also an additional sum equal to the sum of his regular and overtime payment, which the Act terms "liquidated damages," a euphemism for the penalty imposed on the defendant, unless he proves he acted in good faith without unlawful intent or reason to believe that he was violating the Act. And moreover, in such case, the court is required to award attorney fees to plaintiff's counsel.

These provisions have a strong tendency to commercialize the practice of law; and when the law is administered for profit, the ideal of justice is lost. It is the duty of a Federal judge to enforce the acts of Congress, but the enforcement of such enactments in many cases severely strains the judge's patience and conscience. Vigorous and undiscriminating enforcement begets contempt for law and disrespect for government. If the government is unable or unwilling to enforce a law by its own impartial agents, it ought not enact the law. One of the causes of the disintegration of the Roman Republic was the practice of farming out the tax-gathering to commercial agents.

The evidence revealed that this case would not have been filed but for the instigation of a government inspector or investigator who incited the plaintiff to action. Such conduct was considered champerty and forbidden by common law. When the government, through the champertous conduct of its own agents, stirs up litigation among otherwise peaceful citizens, is it any wonder that our courts are congested with pending cases?—cases many of which involve issues and amounts unknown in Federal courts forty years ago.

There are ways in which government can influence and support fair wages without violating established principles of Anglo-American jurisprudence or sound principles of economics. A proper operation of a public works program would serve to standardize fair wages and stabilize the labor market. The welfare of the state can be established without developing a police state if government, industry and labor will cooperate in Scientific Capitalism.[1]

Our difficulties of administration arise from the fact that Congress, under pressure from selfish blocs, special interests, and impatient reformers, enacts laws that are not consonant with The Law. As Dean Pound says, "we must distinguish between 'law' and 'a law'—between law and a body of rules of law." Rules of law, he says, without more, may be instruments of tyrants and dictators—they may be laid down and applied arbitrarily. But the vital and enduring part of The Law is in principles—starting points for reasoning, not in rules. Principles are universal and remain relatively constant or develope along constant lines, and The Law is "experience developed by reason and reason tested by experience."

If a government not of men but of law is to be maintained, the enactments of Congress and the decrees of courts should express, not arbitrary will, but The Law, Charles H. McIliwain, Professor of The Science of Government in Harvard University, closed his excellent work on "Constitutionalism Ancient and Modern" with this observation:

1. "A Manual of Scientific Capitalism," Barradas League, San Francisco, 1954; "Scientific Capitalism," Pageant Press, New York, 1956; Publications by Gerald Barradas, 373 Chumalia Street, San Leandro, California.

" * * * even in a popular state, such as we trust ours is, the problem of law versus will remains the most important of all practical problems."

Even if this note or commentary is not essential to the decision of this case, still it will reveal the attitude of the court toward the statute that formed the basis of the decision. While it is recognized that opinions should be brief and free from extraneous personal views, yet from earliest times it has been considered a part of the judicial function to comment on the general effect of certain laws on the commonweal.