**Buell ADKINS, Plaintiff,**

v.

**CAMPBELL BROWN & COMPANY, Inc., Defendant.**

**Civ. A. No. 1010.**

United States District Court
S. D. West Virginia,
at Huntington.

Dec. 6, 1960.

**554**

Houston A. Smith, Hamlin, W. Va., and T. Dale Wilson, Huntington, W. Va., for plaintiff.

Robert H. Burford and William A. Beckett, Beckett & Burford, Huntington, W. Va., for defendant.

HARRY E. WATKINS, District Judge.

This is an action, heard by the Court, to recover minimum wages, overtime compensation, and an additional equal amount as liquidated damages and reasonable counsel fees, under the provisions of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. §§ 206–219. Jurisdiction is conferred by 28 U.S.C.A. § 1337. The first question which must be decided is whether plaintiff was, during the periods and times of alleged employment, an employee within the meaning of the Fair Labor Standards Act.

The plaintiff, Buell Adkins, a one-time resident of Ranger, West Virginia, had been working for approximately eleven years in Detroit, Michigan. He was laid off from his work there on April 12, 1957, for a period of approximately twenty-one months. Shortly after the date on which he was laid off, Adkins returned to Ranger, West Virginia, where he exhausted his unemployment insurance.

The defendant, Campbell Brown and Company, Incorporated, is engaged in the removal of coal from the Guyandotte River bottom. It conducts this operation near Ranger, West Virginia, from its property on the bank of the Guyandotte River. At the site of the operation, there is about one acre of ground, bordered on one side by the river, and with a road leading to the property from another direction. Within the confines of the company property, there is located the various equipment necessary for the coal removal operation, a boat or barge in the river tied up to company property, a shanty or shack, and a house trailer.

Defendant corporation was represented in the employment negotiations resulting in this suit by Campbell Brown, the president and general manager of the corporation, and by Hubert Elkins, the foreman of the corporation.

The parties agree that plaintiff resided on defendant's premises from February 25, 1958, through October 25, 1958, and that during this period, plaintiff received the sum of $50 per month from defendant corporation. It is also not contested that as to any extra work plaintiff did, other than his night watching, for defendant corporation, he was paid at the rate of $1 per hour. It was further agreed that plaintiff and his housekeeper were allowed to use and occupy a house trailer located on defendant's premises rent free, and that gas and electricity were also furnished free

of charge during the period of occupancy. It is not contested that defendant corporation was engaged in interstate commerce, and that plaintiff was an employee engaged in the "production of goods for commerce," so as to bring this case under the provisions of the Fair Labor Standards Act.

As to the employment agreement between the two parties, definite points of disagreement exist as to the time and place of the meeting, and also to the very terms of the agreement. It is the testimony of plaintiff that sometime prior to February 25, 1958, he was informed by Essie McCoy, a woman associated with plaintiff during the period in question, that he might obtain employment with defendant corporation. As a result of this information, he and Essie McCoy went in the latter's truck to the location of the dredging operation of defendant corporation, and there conferred in the truck with Hubert Elkins, the foreman of the defendant corporation. Plaintiff's version of the employment agreement is that he was to receive $50 a month for night-watching, twelve hours a day, seven days a week, from 6:00 o'clock in the evening until 6:00 o'clock in the morning, and that during this time he was to make trips along the bank approximately every two hours. He was also to be given extra work in the afternoons, after he had slept, for which he was to be paid $1 per hour, such work to bring his pay up to about $35 or $40 per week. Plaintiff stated that it was further agreed that while he was employed by defendant corporation, he was to live in a trailer on company property. Plaintiff also testified, and these statements are not contradicted, that he was given three firearms to have on the property, that he closed and locked a gate on company property every night, and opened it every morning, and that he turned on some outside lights in the evening and turned them off in the morning. He stated that during his period of employment he never once left the property or slept at night, and that one of his duties was to sell coal during the day when neither Elkins or Brown were on the premises. Plaintiff admitted that any time he had to let the barge in or out because of changes in the height of the river, it was considered extra work and he was paid $1 per hour whether it occurred during the day or night.

Essie McCoy's testimony largely substantiated that of plaintiff. She also said that the agreement was confirmed by Campbell Brown. She further testified that she and plaintiff had a contract, whereby he was to build her a house, and she was to furnish him room and board until he went back to Detroit. She stated that this was why she moved into the trailer on the Campbell Brown property, so that she could carry out her end of the contract and furnish room and board for plaintiff.

Elkins' testimony is to the effect that all negotiations as to plaintiff being employed were conducted between him and Essie McCoy, when they met while Elkins was shopping in the town of Ranger, two or three days before Essie McCoy and plaintiff moved onto the Campbell Brown property. He testified that the above conversation in the truck did not occur. His testimony as to the employment is to the effect that he told Essie that she and plaintiff could move into the trailer and shack on the property of defendant corporation without paying any rent, as he wished someone to stay on the property. He stated that Essie McCoy told him that she and plaintiff were not married and that she wanted a separate place for him to sleep, and that he told her plaintiff could sleep in the shack while she could sleep in the trailer. According to Elkins, this conversation resulted in plaintiff and Essie McCoy moving onto the company property shortly thereafter. During a later discussion between Elkins, plaintiff and Essie McCoy, it was agreed that the plaintiff should be paid $50 per month in return for his living on the property. Elkins testified that he specifically told plaintiff and Essie McCoy that plaintiff did not have to stay up at night, but to just be seen about the property two or three

times at different hours. He further testified that plaintiff had no further duties, but that he believes that plaintiff did open and close the gate on the road leading to the company property, and turn certain flood lights on and off, having never been instructed to do those tasks. Elkins also stated that plaintiff was to be given, and was given, extra work, for which he received $1 per hour.

Campbell Brown testified that neither he, nor Hubert Elkins in his presence, ever told Essie McCoy or plaintiff that it would be necessary for plaintiff to stay awake from 6:00 o'clock in the evening to 6:00 o'clock in the morning, or work as a night watchman during these times.

At any rate, plaintiff and Essie McCoy did move onto the property of defendant corporation on February 25, 1958. Essie McCoy moved into the trailer, with her personal belongings and those of plaintiff, and plaintiff states that he spent his time between 6:00 o'clock in the evening and 6:00 o'clock in the morning in the shanty, which was about 100 feet from the trailer, and walking about the property. According to his testimony and that of Essie McCoy, and this is uncontradicted, he generally, after finishing his shift at 6:00 o'clock in the morning, slept for an hour or so in the trailer, and then went to the house he had built for Essie McCoy, four miles from the Campbell Brown property, to sleep for an additional four or five hours. He would then come back to the corporation property to be ready for work at 6:00 o'clock in the evening. These habits were varied on some days when Essie McCoy had chores to do which necessitated her presence at the trailer, or when plaintiff worked on one of the automobiles or trucks which he owned and kept on Campbell Brown property.

Just prior to plaintiff's moving onto the Campbell Brown property, another man, Floyd Alberts, had lived in the trailer and done other work around the premises for the company. His testimony indicated that he slept at night and did work for the corporation during the

day, and that he was asked to keep an eye on the boat. He felt this boat watching was no part of his duties, and just did it on his own account. It is interesting to note that this man should be considered an impartial witness, or perhaps one hostile to the defendant, as he was fired from his position with the defendant corporation.

After plaintiff left the property of Campbell Brown, another man, John Webb, moved into the trailer. His testimony indicates that he sleeps all night, occasionally goes around the property to see that everything is all right. He stated that he receives $50 per month for living in the trailer. He further stated that his duties included taking care of some of the flood lights on the property, and opening and closing the gate.

Other facts which were brought out in the testimony, and which were not contradicted, are that Elkins was off work because of a nervous condition for some time after plaintiff came to live on the property; that Elkins' position was filled by the hiring of another man; and that there was no one needed to watch the boat every night as the water usually rose and fell gradually, but that when high water did occur, a man was paid to watch the boat during the night. It was further brought out without contradiction, that sometime during September of 1956, the barge tied up to defendant company's property was dynamited, and that during plaintiff's employment a conveyor belt, located in the town of Ranger, and used to load the coal into train cars, was cut by unknown persons.

■■ As to the findings of fact necessary in this case, it is the finding of this Court that the employment agreement between plaintiff and the Campbell Brown Company was to the effect that plaintiff and Essie McCoy were to be allowed to reside in the trailer and shanty on defendant's property, were to be furnished gas and electricity free of charge, and that plaintiff was to be paid $50 per month and furnished with enough extra

work at a rate of $1 per hour to bring his weekly wage up to about $35 or $40. In return, plaintiff was to establish living quarters on the company grounds, and be seen about the property two or three times after operations had closed for the day. Plaintiff did not maintain any regular hours of employment, but merely resided on the property of defendant. It is the finding of this Court that plaintiff was not an employee within the coverage of the Fair Labor Standards Act during the times and periods alleged in the complaint, being from 6:00 o'clock in the evening to 6:00 o'clock in the morning from February 25, 1958, through October 25, 1958. It is further found that the terms of the agreement between plaintiff and defendant did not violate the provisions of the Fair Labor Standards Act.

In arriving at the above findings, this Court has considered the entire record, and it is felt that some of the factors upon which the findings are based should be set out.

1. The testimony of the men employed by Campbell Brown & Company before and after the plaintiff, indicates that their agreements with defendant corporation were similar to that which both Elkins and Campbell Brown described concerning plaintiff.

2. When Adkins actually tended defendant's boat during changes in the height of the river, he was compensated at the rate of $1 per hour, whether this occurred during the day or night. The fact that plaintiff would receive compensation during the night hours for this work is inconsistent with the theory that he was already on the pay roll during those hours.

3. If plaintiff was to spend all his time between 6:00 p. m., and 6:00 a. m., keeping watch on the property of defendant, there was no reason for Essie McCoy to leave her home approximately four miles away, and move into the trailer on defendant's property, as plaintiff would have been busy working between 6:00 p. m., and 6:00 a. m., and could have spent the rest of the day at her house for his sleeping time and meals. It would appear that Essie McCoy felt that there would be time for some companionship between her and plaintiff during the times that he testified that he was night watching.

4. The testimony in this case given by plaintiff and Essie McCoy on the one side, and Elkins and Campbell Brown on the other, was in direct conflict on the terms of the employment agreement. In such instance, the Court has the opportunity to observe the demeanor of the witnesses on the stand, weigh their interest in the matter concerning which they are testifying, and give such weight to their testimony as would seem proper under the circumstances.

As to section 211(c) of the Fair Labor Standards Act, requiring an employer to keep records "of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, * * * ", this requirement has no applicability in the case at hand, as plaintiff was not an employee of the Campbell Brown Company within the meaning of the Act, except during those times when extra work was given to him under the employment agreement. For such actual working time, plaintiff was paid in accordance with the minimum standards of the Fair Labor Standards Act.

The case of Armour & Co. v. Wantock et al., 1944, 323 U.S. 126, 65 S.Ct. 165, 168, 89 L.Ed. 118, cited by counsel for plaintiff, is not in point here. The litigation concerned the time during which fireguards were required to be on the employer's premises, to some extent amenable to the employer's discipline, subject to call, but not engaged in any specific work. The company provided cooking equipment, beds, radios, and facilities for amusement. The men slept, ate, or entertained themselves much as they chose. They were not, however, at liberty to leave the premises except that, by permission of the watchman, they

might go to a nearby restaurant for their evening meal. On the question of whether during the time in question, the men were employees under the Act, the Supreme Court, in sustaining both courts below that time spent on the employer's premises by fireguards subject to call—excluding time spent sleeping and eating—was working time compensable under the Fair Labor Standards Act, stated:

"Of course an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer. *Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case.*" (Emphasis added.)

As Judge Barksdale said in the case of Shupe et al. v. Day et al., D.C.W.D. Va.A.D., 1953, 113 F.Supp. 949, 952,

"It seems to me that the last sentence of this quotation fits our situation like a glove. Under all the circumstances of this case, I do not feel any doubt, and therefore conclude, that Caston Green Shupe's time was not spent predominantly for his employer's benefit, but was definitely spent for the benefit of Shupe himself."

It is my opinion that Judge Barksdale's statement fits this case like a glove. Plaintiff spent the time from 6:00 p. m. to 6:00 a. m. for his own benefit, and not that of his employer.

In the Shupe case, defendants were engaged in timbering and sawmilling in Wise County, Virginia, and had been engaged in the lumber business for many years previously. During all their years of sawmilling, defendants found it desirable to locate their sawmills close to some human habitation, but, in at least two instances, including the operation here in question, the sawmills were located in remote places, so defendants built shacks near the mills and employed people to live in them. Defendants went to plaintiff's home and told him that he could move into the shack and live there while the sawmill operation continued, and for living there they would pay him $75 per month while the mill was not in operation, and an additional $25 per month while the mill was in operation, as compensation for cleaning sawdust and bark from under and around the cut-off saw. The only duty or work required by defendants of plaintiff was the cleaning around the mill, which was a task requiring not more than one and a half hours per day. The $25.00 per month compensation paid plaintiff for this work was in excess of the minimum required by the Fair Labor Standards Act. Judge Barksdale summed it up in this finding of fact:

"Specifically I find: * * * (4) That Caston Green Shupe (plaintiff) was employed specifically to clean sawdust and dust from the mill, for which he was paid more than the minimum required by the Act, and to live in defendant's shack, which latter situation is not within the coverage of the Act."

It is the finding of this Court that plaintiff was employed to do extra work for Campbell Brown & Company, for which he was compensated in accordance with the requirements of the Fair Labor Standards Act, and to live on defendant's property, which latter situation is not within the coverage of the Act.

This opinion is adopted as the findings of fact and conclusions of law of this Court. Counsel for defendant Campbell Brown & Company may prepare an order according to the views expressed herein.