JOSÉ GUILLERMO DEYÁ ET AL., SANTIAGO RAMOS, Complainants and the latter Appellant, *v.* OTIS ELEVATOR CO., Defendant and Appellee. OTIS ELEVATOR CO., Petitioner, *v.* SUPERIOR COURT OF PUERTO RICO, SAN JUAN PART, M. A. VELÁZQUEZ RIVERA, JUDGE, Respondent.

Nos. R-62-133, C-62-56.     Decided January 22, 1965.

*Víctor M. Bosch* and *Roberto Armstrong, Jr.,* for workers. *Beverley, Castro & Rodríguez Lebrón,* and *Iván Reichard* for the Company.

Division composed of Mr. Justice Blanco Lugo, as Chief Judge of Division, pro tempore, Mr. Justice Dávila, and Mr. Justice Ramírez Bages.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

In *Heirs of Meléndez* v. *Central San Vicente,* 86 P.R.R. 377 (1962), we had occasion to lay down a general rule for determining compensability for waiting time. We pointed

out that the solution depends on a consideration as a whole of the circumstances of each case in particular, but that it depends to a great extent on (1) the degree of freedom to engage in personal activities during the inactive period in which the employee is subject to be called to render services; (2) the number of consecutive hours during which the employee is subject to be called; and (3) the benefit which the waiting represents to the employer or to his business. The petitions submitted to our consideration require the application of the rule within the modality known as working "on call time." By way of illustration, and by the persuasive force of administrative experience, we copy the provisions of the regulations adopted by the Federal Administrator of the Wage and Hour Act, 29 C.F.R. 1949, § 785.17[1] (Supp. 1962), which read:

"An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while 'on call.' An employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call."

These claims were made by employees Santiago Ramos and Guillermo Deyá against Otis Elevator Co., an enterprise engaged in the sale and installation of elevators in commercial, industrial and residential establishments. As part of the services rendered to its customers, it has a division for the maintenance and repair of the different units. As a general rule these services are rendered during working hours —from 8 a.m. to 5 p.m.—but in the case of establishments

---

[1] It preserved identical wording in the 1964 Supplement.

In view of the power vested in the Secretary of Labor by § 17 of Act No. 379 of May 15, 1948, 29 L.P.R.A. § 286, it would be advisable to adopt pertinent regulations for determining the hours worked as part of the daily working period, especially as to time to wait, to sleep, to rest, etc. See 29 C.F.R. § 785.5 et seq.

which operate during the whole day, an emergency service is offered outside the regular hours. In such cases the contract stipulates a greater sum to cover the additional expenses incurred.

The trial court settled the fundamental conflict in the evidence on the nature of the services rendered, and in fact it rejected defendant's version that the work required of complainants and which we shall recite, was purely voluntary to the point that they could disregard emergency calls without being subject to disciplinary measures. With this fundamental proposition in mind, let us see the statement of the case in the words of the magistrate who took cognizance of the case:

"Complainant Santiago Ramos started to render services for appellee on June 11, 1949 [should be July]. On that date he was designated mechanic apprentice of the enterprise. A few months later the company promoted him to elevator route inspector. His regular working day lasted from 8 a.m. to 5 p.m. Ramos performed the repair tasks assigned to him. At the end of his work in the unit needing repair, it was his duty to call up the central offices where the next job of the day was assigned to him. Complainant then went to the new address given him, and continued working until it was time to stop work, which usually was 5 p.m.

"After a year and a half of working under the circumstances noted, Ramos was called for consultation by Esteves, the company's acting manager. The latter informed him that the corporation was going to install a telephone in complainant's residence, the number of which would appear in the telephone book in the name of 'Otis Elevator Co.' The idea conveyed by the manager to Ramos was that during the period comprised between 5 p.m. and 8 a.m. of the following day the customers of the company entitled to emergency service during nonworking hours could call the number of the telephone installed in Ramos' residence and obtain the repair services needed. Complainant accepted the commitment. As a result, the corporation installed the telephone and paid the corresponding rate to the telephone company.

"The system operated in such a way that Ramos discharged his regular duties in the enterprise from 8 a.m. until 5 p.m. of each day. At that hour he went home where he engaged in his usual activities such as reading, listening to the radio, talking with his family and friends, repairing home furnishings, eating, sleeping and the like. Whenever some customer of the enterprise called for emergency service in one of the elevators installed, Ramos took the call and went to the place indicated, regardless of the hour of the emergency. The evidence offered during the hearing was to the effect that such calls and the consequent repair work were not very frequent, ranging between three and four times a month. It was agreed between complainant and appellee that whenever there arose emergencies of this type, Ramos was required to submit a written report on the details of the case, and on the basis of such information the company paid him for the time actually spent in the repair and the time spent in travelling back and forth from his home to the place of the emergency. The compensation paid on these occasions was computed on the basis of the pay rate fixed for overtime work. During this period Ramos could not leave his house during such intervals of time as might conflict with the responsibilities he had assumed. When he did, his wife answered the telephone whenever necessary, and he would leave word where he could be reached. This was the practice followed even on Saturday and Sunday of every week as well as on holidays when complainant was not performing work for the enterprise during the regular period.

"Late in 1952 a change was made in the management of appellee corporation. Campbell entered upon the discharge of his managerial duties in Puerto Rico. Complainant presented to him his objections on the prevailing working conditions. As a result, Ramos was granted a 12-hour period in the month when he would not be required to remain home awaiting emergency calls. One Sunday in the month was set aside when Ramos would not be required to be on customary call during the period from 8 a.m. to 8 p.m. Such was the existing situation until a supervisor named Fucol arrived from the United States on a special assignment, and ordered that complainant be relieved from the obligation to have an enterprise telephone in his home. The telephone was therefore disconnected and Ramos

continued performing his work for the enterprise only during the company's regular work hours.

"In September 1954 the management of the company in Puerto Rico was entrusted to David Moier. Moier called complainant Ramos in December 1955 and informed him that the corporation would make a new arrangement for handling the problem of services to be rendered during nonworking hours. Moier explained that the enterprise had contracted with a service agency known as 'Telephone Answering Service and Radio Call' which would provide appellee's employees with a means whereby the customers needing services during nonworking hours could reach them. When this arrangement was made, there was established a register of mechanics to take turns, and they were provided with a small radio transmitter and receiver [it was only a receiver] the size of a pack of cigarettes. The arrangement required the mechanic on duty, at the end of his regular working period, to carry the radio with him and to turn it on—close to his ear—at 10 to 15-minute intervals in order to get in touch with the offices of the 'Telephone Answering Service.' If there was any emergency call within those 15 minutes, the agency advised the mechanic by radio, who then took his work tools and went to the place where his services were required. It was the duty of the mechanics on duty to carry the transmitter [it refers to the receiver] with them and turn it on at 15-minute intervals only until 11 p.m. of each working day, since as of that hour the Telephone Answering Service would not render services. On Saturday, Sunday and holidays it was the duty of the mechanics on radio call to turn on the transmitter at the intervals already mentioned during the hours between 8 a.m. and 11 p.m. Nothing prevented the mechanics in this type of task to engage in the customary activities at home or to go to some other place carrying their transmitters, except for two important limitations, to wit: they could not leave the metropolitan area, nor attend gatherings where alcoholic liquor was imbibed, since they were expected to be in good physical condition to perform adequately the emergency repairs where and whenever they were required. It is to be noted further that the transmitter does not work normally in closed rooms, for which reason the mechanic on duty could not go to the movies, to church, to an evening classroom, or other similar places unless he was willing to leave the premises

and go out in the open at 15-minute intervals in order to establish the corresponding communication. The mechanics took weekly turns and received pay—computed on the basis of overtime work—for those occasions when they actually and effectively repaired an elevator, including the time spent in travelling to the place of the repair.

"In order to complement the work of the mechanics on duty when the radio-call arrangement was adopted, the manager of the enterprise informed Ramos that it was necessary to reinstall a company telephone in his residence. In such case every customer entitled to emergency service could call the number appearing in the telephone book in the name of the employer between 11 p.m. and 8 a.m. of the following morning during which the radio call did not operate. Moier told Ramos that another telephone would be installed also in the house of another employee named Ismael Rivera in order that both of them would take weekly turns during the call periods. Naturally, both were relieved from the obligation to be on call on Saturdays, Sundays and holidays until 11 p.m. because the mechanics working on the radio-call system would perform the work. Ramos accepted the commitment. Thereafter his call period was limited to two weeks a month and only during the evening hours. The telephone was thus installed in Ramos' residence although his fellow worker on call was afterwards substituted by mechanic Portela and later by Cruz Fuentes. Ramos ceased in his employment in 1961.

"Complainant Guillermo Deyá, on his part, started to render services for defendant corporation in 1955, when the radio-call system was established. The evidence offered during the trial was to the effect that he was one of the mechanics assigned to perform work under the radio-call system; that he performed his work under the said system in the manner described hereinabove and that he was compensated for the regular working period, but was not paid any sum for remaining on duty awaiting emergency calls. Naturally, on those occasions when he actually and effectively performed some emergency repair work in the period between 5 p.m. and 11 p.m. he submitted the required reports and received pay for the time spent in the repair, including the time taken for traveling from the place where he received the call to the place indicated."

Other elements of proof which must be taken into account show that Ramos retired around 11 p.m. and that in his opinion "one has more peace of mind when not on duty, could do things better and more efficiently for myself." Deyá, on his part, testified that the fact that he had to turn on the receiver at 15-minute intervals prevented him from performing work in his home.

The trial court determined that Deyá was performing work for the employer during the hours when he was on duty from 5 p.m. to 11 p.m. of certain days, based on the fact that (a) the period during which he was required to turn on the radio receiver at 15-minute intervals was more profitable for appellee enterprise; (b) complainant was actually restricted in his personal activities; (c) the enterprise received additional compensation for emergency service outside of nonworking hours.[2] On the other hand, it dismissed Ramos' claim on the ground that (a) he was not required to perform any actual work; (b) while on call time he enjoyed a degree of personal freedom which permitted him to engage in his own activities and chores.

■ As recited hereinabove, there is no steadfast rule that can be applied in these cases. It is necessary to consider the circumstances as a whole and to attempt to establish with reasonable certainty whether the waiting is part of the working period. This is particularly difficult where, as in the present case, factors pointing to both findings concur within a particular set of facts. We have examined closely the case law cited by the parties and others which we have found, and except for a reiteration of the general doctrine announced

[2] The only evidence offered on the matter does not sustain that the company derived an additional benefit from the emergency service given, since the monthly amount stipulated in the contracts has been determined on the basis of the average number of services per elevator rendered in a year. The cost has been prorated among the different subscribers and represents the general incidence rather than the incidence of each customer in particular.

in *Heirs of Meléndez* v. *Central San Vicente, supra*, they do not help much in resolving the present controversy. Because of the varied circumstances presented, an analysis thereof would not lead to any practical result.[3]

However, it is well to mention the following passage which by way of dictum appears in *Dumas* v. *King*, 157 F.2d 463, 466 (8th Cir. 1946): "Nor does the contention merit serious consideration that the court as a matter of fact should have held that King was on duty 24 hours a day, because it had been agreed that he might be called to the plant from his home at any time, if something went wrong with the machinery. The evidence shows that he was free to go where and do what he pleased during his alleged waiting time, and that he did so, only advising the plant where it would be possible to reach him in case of an emergency."

---

[3] *Skidmore* v. *Swift & Co.*, 323 U.S. 134 (1944); *Armour & Co.* v. *Wantock*, 323 U.S. 126 (1944); *Aeromotive Metal Products, Inc.* v. *Wirtz*, 312 F.2d 728 (9th Cir. 1963); *Mitchell* v. *Turner*, 286 F.2d 104 (5th Cir. 1960); *Mitchell* v. *Greinetz*, 235 F.2d 621 (10th Cir. 1956); *Van Dyke* v. *Bluefield Gas Co.*, 210 F.2d 620 (4th Cir. 1954); *Handler* v. *Thrasher*, 191 F.2d 120 (10th Cir. 1951); *Republican Pub. Co.* v. *American Newspaper Guild*, 172 F.2d 943 (1st Cir. 1949); *Central Missouri Tel. Co.* v. *Conwell*, 170 F.2d 641 (8th Cir. 1948); *Bridgeman* v. *Fort, Bacon & Davis*, 161 F.2d 962 (8th Cir. 1947); *Bell* v. *Porter*, 159 F.2d 117 (7th Cir. 1946); *Bowers* v. *Remington Rand*, 159 F.2d 114 (7th Cir. 1946); *Rockey* v. *Day & Zimmermann*, 157 F.2d 734 (8th Cir. 1946); *Perry* v. *George P. Livermore, Inc.*, 165 S.W.2d 782 (Texas 1942); *Hernández* v. *Ethyl Corporation*, 83 So.2d 150 (La. 1955); *Remisiewski* v. *Parodi Cigar Co. of New York*, 64 A.2d 93 (N.J. 1949); *Wirtz* v. *Healy*, 227 F.Supp. 123 (Ill. 1964); *Arthur* v. *K. D. Emrick Well Servicing Company*, 209 F.Supp. 491 (Okla. 1962); *Adkins* v. *Campbell Brown & Company*, 189 F.Supp. 553 (W. Va. 1960); *Wright* v. *Carrigg*, 174 F.Supp. 27 (S.C. 1959); *Shupe* v. *Day*, 113 F.Supp. 949 (Va. 1953); *Campbell* v. *Jones & Laughlin Steel Corporation*, 70 F.Supp. 996 (Pa. 1947); *Eustice* v. *Federal Cartridge Corporation*, 66 F.Supp. 55 (Minn. 1946); *Bohn* v. *B & B Ice & Coal Co.*, 63 F.Supp. 1020 (Ky. 1946); *Walling* v. *Bank of Waynesboro, Ga.*, 61 F.Supp. 384 (Ga. 1945); *Buckner* v. *Armour & Co.*, 53 F.Supp. 1022 (Texas 1942); *Thompson* v. *Loring Oil Co.*, 50 F.Supp. 213 (La. 1943); *Travis* v. *Ray*, 41 F.Supp. 6 (Ky. 1941). See, also Annotation, *What is considered as working time within contemplation of overtime provisions of Federal Fair Labor Standards Act*, 89 L.Ed. 130 (1944), and 33 Va. L. Rev. 44, 58–60 (1947).

And in *Super-Cold Southwest Co.* v. *McBride*, 124 F.2d 90 (5th Cir. 1941), it was held that an employee who merely had to leave his telephone number or place where he could be found was not engaged in work within the contemplation of the Federal Wage and Hour Act. See P-H Lab. Rel. Serv. § 9129, and especially § 9129.2.

■ As respects Deyá, it is unquestionable that the work arrangement imposed effective restrictions upon his personal activities, though this does not mean that he was a captive of his employment duties. On the contrary, although Ramos had certain limitations, these were minimum and he could engage in the activities and chores of an employee at the end of the daily working period, with the exception of Saturdays, Sundays and holidays, when his continued permanence at home awaiting emergency calls, or in a place where he could be called in the manner appearing from the evidence, is not consistent with the normal standard of conduct of a reasonable man. Since the evidence showed that the calls were not frequent—an average of three or four a month—Ramos ordinarily enjoyed a normal eight-hour rest period. This period or the additional hour to take food, clean up, etc., shall not be included as part of the working period. In its just perspective, it may be asserted that the work performed by Deyá and by Ramos on Saturdays, Sundays and holidays represented an appreciable benefit for the business of appellee in its relations with its customers, and that the benefit received by claimants—pay for repair work actually performed—was insignificant. The factor of number of consecutive hours during which the employee was on call is not controlling in this case.

In conclusion, Deyá must be compensated in the manner provided by the trial judge, and the writ issued to review the order of respondent court will therefore be quashed. As to Ramos, the judgment rendered will be modified pursuant

to the terms of this opinion and the case will be remanded for further proceedings.